LINUS L. BAKER KS 18197
6732 WEST 185TH TERRACE
STILWELL, KANSAS 66085
913.486.3913
LINUSBAKER@PRODIGY.NET
*Attorney for LYNN A. McALLISTER*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Lynn A. McAllister <br><br>               Plaintiff <br><br> v. <br><br> Tyson Fresh Meats, Inc. <br><br>             Defendants <br> SERVE: <br> United Agent Group Inc. <br> 4601 E Douglas Avenue #700 <br> Wichita, KS 67218 | Case No.   5:24-cv-4054 |

### COMPLAINT

The plaintiff Lynn A. McAllister for his Complaint states as follows:

### JURISDICTION AND VENUE

**1.** The Court has personal and subject matter jurisdiction under Title VII of the Civil Rights Act of 1964.

**2.** Venue is proper in this judicial district as the defendants regularly conduct substantial business activity in the state of Kansas.

### PARTIES

### PLAINTIFF

**3.** The plaintiff Lynn A. McAllister is an adult citizen of the United States and a resident of the state of Kansas.

**4.** Tyson Fresh Meats, Inc. (Tyson) or (The Company) employed Lynn A. McAllister as a Senior Facility Engineer.

**5.** Mr. McAllister began his employment with Tyson on October 20, 1999, and held the title of Senior Facility Engineer at Tyson's Emporia Kansas facility.

1

**DEFENDANT**

**6.** Tyson Fresh Meats, Inc., has its principal place of business at 2200 Don Tyson Parkway CP131, Springdale AR 72762.

**7.** Tyson Foods Inc. and Tyson Fresh Meats Inc. operate a Beef Processing Facility at 2101 West 6th St. Emporia, Kansas.

**ADMINISTRATIVE PREREQUISITES**

**8.** Plaintiff McAllister filed a Charge of Discrimination with the Equal Employment Commission against the defendants on January 28, 2022, which was assigned the charge number 563-2022-00710. The Charge was designated as "ongoing" and "current."

**9.** Mr. McAllister filed an amended charge with 41 exhibits on February 13, 2023.

**10.** Mr. McAllister submitted additional evidence on February 8, 2024.

**11.** Defendants received notice of the charge and amended charge.

**12.** On May 22, 2024, the EEOC issued Plaintiff a right-to-sue notice authorizing him to commence a civil action within 90 days.

**13.** This action was filed within 90 days of the EEOC's issuance of the plaintiff's right-to-sue notice, and within two years of the discrimination alleged herein.

**COUNT I**
**TITLE VII, 42 U.S.C. § 2000 | BAD FAITH DECEPTIVE INTERACTIVE PROCESS**

**14.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**15.** Tyson decided, before enacting its vaccine policy, and before communicating with Mr. McAllister, what Tyson would do in terms of any accommodation to Mr. McAllister's religious practices.

**16.** An employer who determines what accommodation it is willing to offer before ever speaking with the employee does not participate in good faith in the interactive communication process.

**17.** Tyson offered Mr. McAllister a leave of absence it called Tyson's Leave of Absence Plus ("LOA Plus") program, which meant Mr. McAllister would lose his position with one year of unpaid leave with the continuation of his healthcare benefits with premium contribution from Tyson.

**18.** Tyson's "one-size-fits-all accommodation scheme" amounted "to a realistic, drastic reduction in pay - alternative to termination - for any employee seeking a

religious accommodation." *McNeill v. Tyson Fresh Meats, Inc.,* No. 2:23-cv-00041-Z 2023 WL 8532408 at *13, fn.1 (N.D. Tex. 12/8/2023).

**19.** On August 3, 2021, Tyson published a requirement to Mr. McAllister that he would be required to consent to being injected with covid-19 vaccines as a condition for work. Tyson referred to the new condition as being "fully vaccinated."

**20.** Requiring Mr. McAllister "to work without religious accommodation where a work rule conflicts with his religious beliefs necessarily alters the terms and conditions of his employment for the worse." *McNeill v. Tyson Fresh Meats, Inc.,* at *6 (quoting EEOC, Compliance Manual Section 12: Religious Discrimination § 12-IV.A (2021)(citing 42 U.S.C. § 2000e-2(a)(l)).

**21.** Mr. McAllister was retaliated against because he spoke out as "Covid Coordinator" and because he requested a religious accommodation from a company policy, received a credible threat of a substantial pay cut if he did not comply with the policy, and that threat was directly related to his accommodation request.

**22.** Tyson impermissibly pressured Mr. McAllister "choose between following the precepts of his religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [his] religion in order to accept work." *McNeill v. Tyson Fresh Meats, Inc.,* at *2.

**23.** Prior to August 3, 2021, when Tyson announced its vaccine mandate, it had already pre-determined the only accommodation it would provide Tyson employees seeking religious accommodations would be a one-year unpaid leave of absence – and then termination.

**24.** Tyson gave Mr. McAllister three choices: "(1) capitulate on his religious belief so to comply with the policy; (2) accept immediate termination; or (3) accept up to one-year unpaid leave until either the policy was rescinded, the employee complied, or the leave period expired - culminating in termination." *McNeill v. Tyson Fresh Meats* at *6.

**25.** This "placed Plaintiff between two rocks and a hard place. Instructing an employee that to keep your job, you must violate your faith - by abandoning your religious conviction ... irreversibly - clearly fails Title VII....Voluntary self-termination – even with the possibility of being rehired is not a reasonable accommodation." *McNeill v. Tyson Fresh Meats* at *4.

**26.** Tyson also took overt action to intimidate and silence persons who spread factual information about vaccine efficacy. Tyson engaged in this misconduct to prolong the effectiveness of the company's deception campaign, thereby maintaining the false impression that a Covid-19 vaccine was safe and had more efficacy than in reality.

**27.** Mr. McAllister had been the "Covid Coordinator" at the Tyson Emporia facility but Tyson management disapproved of Mr. McAllister's speech which indicated he

was a skeptic of Tyson's deceptive marketing campaign about Covid-19 and vaccines and Tyson removed him from that position.

**28.** Tyson knowingly and recklessly engaged in a multi-faceted scheme to mislead Tyson employees about the efficacy of a Covid-19 vaccine, including making affirmative misrepresentations, withholding material information, and taking steps to censor and suppress individuals such as Mr. McAllister who disseminated truthful information adverse to this deceptive scheme.

**29.** In 2021, capitalizing on Americans' fear of the unknown in the early days of the COVID-19 pandemic, Pfizer touted its new vaccine as a miracle cure. FDA had just granted Pfizer an emergency use authorization for its vaccine in December 2020.

**30.** In March 2021, Pfizer's own clinical trial results revealed substantial waning efficacy.

**31.** Pfizer's data as of March 13 showed a material decrease in efficacy corresponding to the time after a subject received dose two. Specifically, whereas the risk reduction rate for the window beginning seven days after Dose 2 and ending less than two months thereafter stood at 96%, the relative risk reduction for the window beginning four months after Dose 2 and ending six months after Dose 2 collapsed to 83.7%.

**32.** Tyson knew by around mid-March 2021 that vaccine efficacy quickly deteriorated. On July 28, 2021, Pfizer published its ultimate clinical trial results in pre-print in medRxiv which documented this waning efficacy.

**33.** On June 1, 2021, the Center for Disease Control (CDC) announced that a mutation of the original COVID-19 virus known as the Delta variant had become the "dominant variant" in the United States. By the end of July, CDC Director Rochelle Walensky testified to Congress that the Delta variant was responsible for the vast majority (83%) of COVID-19 infections in the United States.

**34.** Pfizer's clinical trial did not evaluate vaccine efficacy against SARS-CoV-2 variants yet Tyson repeated multiple false and misleading statements or implications about the vaccine's efficacy against SARS-CoV-2 variants, including the Delta variant.

**35.** On July 30, 2021, the CDC released a devastating report about an outbreak of COVID-19 at large gatherings in Barnstable County, Massachusetts. See CDC, Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gathering – Barnstable County, Massachusetts, July 2021 (Aug. 6, 2021).

**36.** The CDC's analysis demonstrated that vaccinated persons caused a significant outbreak of symptomatic COVID-19 among other vaccinated persons at multiple large public gatherings in a Massachusetts. Of the COVID-19 infections associated with the outbreak, nearly three quarters occurred in fully vaccinated persons, a plurality of which had received Pfizer's vaccine.

**37.** Tyson promoted the Pfizer vaccine to Tyson employees such as Mr. McAllister in many ways including the Tyson Covid FAQ website.

**38.** Tyson claimed that requiring each of its employees to be fully vaccinated "was a necessary and effective measure to protect its workforce and contribute to the worldwide effort to combat the COVID-19 pandemic."

**39.** But substantial evidence was present showing that the two vaccines promoted by Tyson had little, and arguably negative efficacy against the Delta variant. As such, this subsequent evidence confirmed that Tyson had no factual basis to make its efficacy representations about Delta in the first instance.

**40.** Tyson was essentially marketing the Pfizer and Moderna vaccines to Tyson employees making false representations to Mr. McAllister about the vaccine's safety and effectiveness as a way to coerce or otherwise convince Mr. McAllister to consent to the medical treatment of vaccine injections.

**41.** Tyson's misrepresentations extended well beyond its 95% efficacy statement. Tyson would go on to mislead Tyson employees and the public across multiple critical COVID-19-related dimensions, including specifically the ability of the vaccine to prevent viral transmission from asymptomatic to uninfected people, the reality of waning vaccine efficacy, and the vaccine's ineffectiveness against the Delta variant.

**42.** Taken alone and in combination, Tyson's misleading statements to Mr. McAllister created the false impression that 95% of vaccine recipients would never obtain COVID-19, full stop.

**43.** Through Tyson's misleading marketing to Tyson employees about the vaccine's efficacy and safety, Tyson was creating consumer demand for Pfizer's vaccine.

**44.** When FDA granted that authorization, it did so with several important caveats. First, at the time, it was not possible to know how effective the vaccine was beyond two months, because Pfizer had only two months of clinical data on infection rates after vaccination.

**45.** FDA made clear that Pfizer needed additional evidence to prove its vaccine protected against "virus shedding and transmission" of COVID-19 to others. Pfizer's clinical trial assessed its vaccine's efficacy against the original strain of the virus only, not against mutations such as the more potent Delta strain.

**46.** Pfizer's CEO, Albert Bourla, went on major news networks promoting that the company's vaccine possessed the very qualities FDA told Pfizer it had not shown. Tyson touted in so many words that "at 6 months, the protection [of the Pfizer vaccine] is robust" – despite Pfizer only having 2 months of data.

**47.** Tyson employees were told by Tyson that getting the Pfizer vaccine prevented transmission and that vaccination was necessary to protect "the people you love most" – despite Pfizer lacking any data on the subject. Tyson parroted Pfizer's CEO public

insistence that the company's vaccine was "very, very, very effective against Delta" – despite Pfizer having little to no clinical data on Delta.

**48.**   When promoting Pfizer's vaccine, Tyson parroted Pfizer's trademark marketing line: That its vaccine was "95% effective." That claim was highly misleading from the start. It represented a calculation of so-called "relative risk reduction" for vaccinated individuals in Pfizer's then-unfinished two-month clinical trial. But FDA finds that statistic misleading, and prefers drug manufacturers to advertise absolute risk reduction: The actual decrease in risk between getting a treatment or not. Pfizer's clinical trial showed absolute risk reduction of only 0.85%.

**49.**   In addition, the medical journal The Lancet published a study on October 29, 2021, showing that vaccinated individuals caused infections within their households at materially the same rate as unvaccinated individuals. Specifically, "fully vaccinated individuals" infected with COVID-19 caused approximately 25% of persons in their household to contract COVID-19, whereas "unvaccinated individuals" with COVID-19 caused infections within their household at a rate of 23%. See Singanayagam et al., Community transmission and viral load kinetics of the SARSCoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study The Lancet (Oct. 29, 2021). Another study published in October 2021 found that to the extent vaccination prevents "transmission," that transmission reduction "decline[s] over time" and "attenuate[s] substantially" for Pfizer recipients a mere "3 months post-second" dose. Eyre et al., The impact of SARS-CoV-2 vaccination on Alpha & Delta variant transmission medRxiv (Oct. 15, 2021).

**50.**   In other words, the Pfizer vaccine reduced a person's risk of getting COVID-19 by less than one percent.  All of Tyson's many misrepresentations to Tyson employees failed to mention this.

**51.**   It is now also beyond quibble that Tyson's unsubstantiated claims ultimately turned out to be false. Countless vaccine recipients contracted COVID, many died, and at least some data shows that the vaccinated experienced worse outcomes than those not "fully vaccinated."

**52.**   Tyson could have accommodated Mr. McAllister not being fully vaccinated by allowing him to work remotely even if it required additional staffing at additional monetary costs to Tyson.

**53.**   Tyson conducted no financial cost analysis of an accommodation proposed by Mr. McAllister on October 26, 2021, which stated:

1. Emporia currently does not have a project manager who develops CIR projects. I filled the roll of Emporia project development manager until 2016/2017. I have trained 2 team members who filled that roll since then. I know the project process and could develop CIR projects from home, if provided the necessary quotes and payback factors.
2. All Value Added product code CTP files are stored on the U:Drive and need to be updated annually. I could provide those updates from home.
3. I could complete all current labor reports from home and assist in the development of new reporting files from home.
4. I could update restricted duty job descriptions and ergo job descriptions from home.
5. If provided with the necessary labor and yield information, I could complete FMPRs from home.
6. I would also be willing to assist in the transition period of someone hired to replace me.

**54.** Tyson did not conduct any economic financial cost analysis to Tyson's overall business in considering allowing Mr. McAllister to work remotely not being fully vaccinated, or being subjected to weekly testing, prior to terminating Mr. McAllister's employment.

**55.** Mr. McAllister had conducted all his responsibilities remotely for two weeks in December 2020. Tyson did not consider and Mr. McAllister was not offered, any opportunities to retain employment at any location with Tyson Foods, Inc. while not being fully vaccinated.

**56.** The efficacy of a Covid 19 vaccine dissipates over time.

**57.** Some Tyson employees received a COVID-19 vaccine before Tyson's Covid 19 vaccine mandate was enacted.

**58.** Some Tyson employees received a COVID-19 vaccine more than six months prior to the enforcement of Tyson's Covid-19 policy.

**59.** Mr. McAllister submitted to Tyson, through his medical provider Dr. J. Samuel Tovar, MD, on September 22, 2021, test results showing that Mr. McAllister had "very high levels of antibody" to the Covid virus.

**60.** Yet Tyson rejected this immunity yet did not test any Tyson employees who were fully vaccinated for any covid virus immunity status.

**61.** On September 22, 2021, Mr. McAllister had the same or superior immunities to the Covid-19 virus as compared to some Tyson employees who were classified as "fully vaccinated." In fact, Tyson never required immunity result testing to ascertain the immunity level status of any employee classified as fully vaccinated.

**62.** Tyson defined "fully vaccinated" as "two weeks following the single dose of the Johnson & Johnson vaccine, or the final dose of a two-shot regimen (Pfizer or Moderna)."

**63.** The Tyson Policy arbitrarily classifies employees based on vaccination status which violates the Equal Protection Clause of the Fourteenth Amendment.

**64.** In order to be "fully vaccinated" Mr. McAllister was required to provide consent to the injections.

**65.** The vaccines referred to by Tyson is a medical treatment and not a traditional vaccine.

**66.** The most the shots can do is reduce the severity of an infected person's symptoms (although even that is debated). Thus, the shots are medical treatments like medication and other therapeutics that people take when they are, or may become, sick.

**67.** The Covid-19 vaccines Moderna, Pfizer, and Johnson & Johnson never prevented the transmission of a Covid-19 virus.

**68.** A spike protein is produced in the body as a result of the inducement of the covid 19 vaccine substance into a person's body.

**69.** A Covid 19 vaccine can create spike proteins which cause micro-clotting throughout the body permanently damaging a person's cardiovascular system.

**70.** The manufacturers of the Moderna, Pfizer, and Johnson and Johnson vaccines have disclosed serious, life threatening side effects of being fully vaccinated including myocarditis and blood clotting.

**71.** The FDA has acknowledged that being fully vaccinated present risks of myocarditis and blood clotting in a person.

**72.** A person being fully vaccinated statistically increases the likelihood of death.

**73.** Tyson employees who were fully vaccinated could become infected with SARS-CoV-2.

**74.** The CDC Director admitted that being fully vaccinated did not prevent infection or transmission of SARS-CoV-2.

**75.** The CDC has acknowledged that the fully vaccinated and those who are not fully vaccinated are equally likely to spread the Covid 19 virus.

**76.** Tyson employees who were fully vaccinated could become re-infected with SARS-CoV-2.

**77.** Tyson employees who were fully vaccinated could transmit SARS-CoV-2 to fellow workers and customers.

**78.** Covid 19 vaccines do not prevent transmission, infection, or reinfection in those who consent to receive them.

**79.** Tyson employees able to comply with Tyson's mandate were vaccinated with either the Pfizer, Moderna, Janssen, or Johnson and Johnson vaccine.

**80.** There was no objective, scientific basis for Tyson to believe that being fully vaccinated protected against Covid-19 transmission when Mr. McAllister's employment was terminated.

**81.** Tyson did not conduct a reasonable investigation into whether requiring Mr. McAllister to be fully vaccinated would prevent the transmission of the Covid-19 virus prior to him termination.

**82.** There was no objective, scientific basis for Tyson to believe that Mr. McAllister would have posed a greater risk to transmitting Covid 19 than any other fully vaccinated Tyson employee.

**83.** Tyson did not conduct a reasonable investigation into Mr. McAllister's immunity status prior to his Tyson employment termination.

**84.** Allowing Mr. McAllister to work not fully vaccinated through November 1, 2022, did not cause employee sicknesses, disruptions, jeopardize safety, cause other employees to work longer hours.

**85.** Tyson   conducted no studies or analysis yielding any documentation that allowing Mr. McAllister to work not fully vaccinated through November 1, 2022, caused or increased employee sicknesses, disruptions, safety risks, or caused or contributed to other employees being required to work longer hours.

**86.** Tyson has no documentation that its vaccination policy reduced the spread of Covid-19 infections or reduced the number of sick days taken by an Tyson employee self-reporting or diagnosed with a Covid-19 infection.

**87.** Tyson has no documentation as to any customers, their number, or dollar amount in sales being lost or reduced by allowing either plaintiff to be employed at him position prior to the effective date of Tyson's vaccination requirement.

**88.** Tyson has no documentation as to any customers, their number, or dollar amount in sales being gained as a result of terminating the plaintiff's employment at Tyson.

**89.** After Mr. McAllister was terminated, Tyson has no documentation showing that there was any reduction in an employee's use of sick days, or health insurance claims arising from a Covid-19 infection.

**90.** At the time Tyson created and administered its Covid 19 policy, CDC guidance and other studies acknowledged that being fully vaccinated did not hinder the transmission of the SARS virus at all.

91. Mr. McAllister did not present any greater workplace safety risk than any other fully vaccinated Tyson employee.

92. Tyson posted Mr. McAllister's position as open prior to his termination.

93. The CDC Director, Dr. Rochelle Walensky, stated on October 8, 2021, that COVID-19 vaccines did not prevent transmission of the Covid 19 virus.

94. A CDC study released in January 2022 demonstrated that a person being fully vaccinated provided no discernible benefit to persons with naturally immunity to the Covid 19 virus.

95. A CDC study released in January 2022 demonstrated that naturally acquired immunity to a Covid 19 virus confers superior protection against the Delta variant.

96. When Tyson enacted its Covid policy, CDC issued revised guidance during that time period to new data "that the Delta variant was more infectious and was leading to increased transmissibility when compared with other variants, even in some vaccinated individuals."

97. As of October 27, 2021, the CDC's "Nowcast" model reported that the Delta variant comprised 99.6% of the variants recently detected throughout the U.S.

98. When Tyson published its vaccine mandate vaccinated individuals were susceptible to infection with the Delta variant and presented a risk of transmitting SARS-CoV-2 to others.

99. The spike protein produced in the body as a result of the inducement of the covid vaccine substance into a body causes micro-clotting throughout the body, permanently damaging the recipient's cardiovascular system.

100. It was known to Tyson prior to Mr. McAllister's employment termination that being fully vaccinated did not prevent transmission.

101. It was known to Tyson prior to Mr. McAllister's employment termination that a fully vaccinated Tyson employee would have been as contagious or even more as a person not fully vaccinated once they contract the Delta variant.

102. Tyson has employed persons since November 2022, who are not "fully vaccinated" as defined under the Tyson Covid-19 Vaccination Policy.

103. Every Tyson employee allowed to be employed by Tyson since November 2022, who was not fully vaccinated did not cause Tyson any undue hardship.

104. Mr. McAllister suffered an adverse employment action when Tyson threatened to suspend his pay.

105. Mr. McAllister suffered an adverse employment action when Tyson stated it would put him on unpaid leave.

**106.** Tyson required Mr. McAllister to an endless supply of boosters to maintain a covid-19 shot's efficacy, leading to a regular cycle of vaccination and revaccination.

**107.** Individuals who consented to the Covid-19 vaccines became sicker than people who did not consent to the injections. There are numerous adverse reactions documented individuals have reported as vaccine injuries in connection with the covid-19 shots.

**108.** The Tyson Policy interfered with the plaintiff's fundamental right to refuse medical treatment.

**109.** The Tyson Policy was imposed merely as a condition of employment but that still requires strict scrutiny. *See Lane v. Franks*, 573 U.S. 228, 236 (2014) ("Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights").

**110.** The Tyson Policy interfered with Mr. McAlllister's substantive due process rights because he has "a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan ex rel. Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278–79 (1990).

**111.** The Tyson vaccine policy violated Mr. McAllister's "fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237–38 (2022). Tyson's mandate to Mr. McAllister that he undergo compulsory treatment for the health benefit of the person treated – as opposed to compulsory treatment for the health benefit of others – implicates the fundamental right to refuse medical treatment forced upon him by Tyson.

**112.** The vaccines referred to by Tyson never effectively prevented the spread of covid-19 but instead purported to mitigate symptoms for the recipient and therefore is akin to a medical treatment, not a "traditional" vaccine.

**113.** The CDC changed the definition of "vaccine" in September 2021,  striking the word "immunity." The CDC conceded that the COVID-19 vaccine is not a "traditional vaccine."  The CDC stated that the vaccine does not prevent transmission, and that natural immunity is superior to a vaccine.

**114.** On August 10, 2021, Tyson updated its "Frequently Asked Questions" regarding Covid-19 Vaccinations and stated that "being fully vaccinated is a condition of employment."

**115.** In the update Tyson also stated that "failing to meet the requirement for employment, which the vaccine now is, without a medical or religious exemption, will be treated as an involuntary termination."

**116.** In the update Tyson stated the "mandate to be vaccinated is a condition of employment and failure to comply will result in an involuntary termination."

**117.** Regarding employees who were pregnant or trying to get pregnant Tyson stated "if their medical provider has a concern, they should provide a note to begin the medical accommodation process."

**118.** Tyson stated in the update to the question "I do not want to be vaccinated due to a religious reason or medical issue.  What should I do?" this: "Speak directly to the HR manager/HR partner at your location. For a medical issue, you will be asked to provide at least a note from your medical provider.  We have a comprehensive process in place to evaluate all requests for accommodations."

**119.** On October 7, 2021, Mr. McAllister wrote to the following asking for information from Tyson Fresh Meats Legal Department and Human Resources Department:

This letter is in regard to the matter of my potential SARS CoV2 (Covid 19) vaccination and my desire to be fully informed and appraised of ALL facts before I render my signature indicating "informed consent" for the herein delineated Covid 19 vaccination contract with Tyson Fresh Meats.  I would be grateful to be provided with all the following list of documents and information, in accordance with Constitutional and statutory legal requirements at all levels of United States jurisprudence.

1.) Can you please provide in written, signed form, the Tyson Fresh Meats SARS CoV2 (Covid 19) vaccination policy which undeniably requires that Covid 19 vaccination is a condition of employment? Does such a policy exist?

2.) Can you please provide Tyson Fresh Meats SARS CoV2 (Covid 19) vaccination exemption policy governing employees?

3.) Can you please provide OSHA (Occupational Health and Safety Administration) vaccination policy for companies in the United States of America who employ greater than 100 employees?

4.) Can you please advise the approved legal status of any SARS CoV2 (Covid 19) vaccine?

5.) Can you please advise the approved legal status of an experimental SARS CoV2 (Covid 19) vaccine?

6.) Can you please provide the medical details and legal assurances that the SARS CoV2 (Covid 19) vaccine Tyson Fresh Meats requires of me as condition of employment has been fully, independently, and rigorously tested against control groups and if so, provide subsequent published outcomes of those tests?

7.)     Can you please advise the entire list of contents of the SARS CoV2 (Covid 19)
vaccine Tyson Fresh Meats is requiring me to take as a condition of my employment?
Can you please advise if any of the vaccine therapy contents are toxic to the human
body?

8.)     Can you please fully advise of all the adverse reactions associated with this SARS
CoV2 (Covid 19) vaccine therapy, being required by Tyson Fresh Meats as a condition of
employment, since its inception and introduction into the human population?

9.)     Can you please confirm that the SARS CoV2 (Covid 19) vaccine Tyson Fresh Meats
is advocating and requiring of me as a condition of my employment is NOT an
experimental mRNA gene altering therapy?

10.)    Can you please confirm that the vaccine Tyson Fresh Meats is advocating and
requiring of me as a condition of my employment is NOT a therapy allowable only under
EUA (Emergency Use Authorization)?

11.)    Can you please confirm that I will not be under any duress from Tyson Fresh
Meats as my employer, in compliance with the Nuremberg Code?

12.)    Can you please advise me of the likely risk of fatality, should I be unfortunate
enough to contract SARS CoV2 (Covid 19) from the vaccine therapy Tyson Fresh Meats is
requiring of me as a condition of my employment? Can you advise me of the likelihood
of recovery from such an adverse reaction risk?

13.)    Can you please advise me if I were to experience any adverse reactions to the
SARS CoV2 (Covid 19) vaccine therapy Tyson Fresh Meats is requiring of me as a
condition of my employment, is the manufacturer of the vaccine therapy liable for said
adverse reactions I may experience?  If the manufacturer is not liable, will Tyson Fresh
Meats be responsible and liable, as it is by their condition of employment that is
requiring me to comply with said vaccine therapy?

14.)     Can you please provide complete documentation advising me why my proof of natural immunity is not sufficient, even more so than vaccination, in defending my body from SARS CoV2 (Covid 19) infection? Can you please advise and provide complete documentation that I, with proof of natural immunity to SARS CoV2 Spike Protein (Covid 19), will suffer no risk of fatality, no adverse reactions, and no ongoing health issues as a result of the SARS CoV2 (Covid 19) vaccination required of me by Tyson Fresh Meats as a condition of my employment? See attachment from J Samuel Tovar, MD dated 9/22/21 5:10 PM regarding my natural immunity.

Once I have received full and complete documentation and confirmation in writing in the form of a contract, in answer to the above questions, and I am satisfied that there is NO threat to my health, I will render my signature indicating "informed consent" for the SARS CoV2 (Covid 19) vaccination Tyson Fresh Meats is requiring of me as a condition of my employment, however, my compliance to receive the vaccination will be with certain **conditions in place**- namely that:

        a. Tyson Fresh Meats will confirm in writing that I will suffer no harm from a vaccination required of me as a condition of my employment,

        b. Tyson Fresh Meats will confirm in writing that they will assume full liability for all adverse reactions I might suffer as a result of taking the Covid 19 vaccine which is required of me as a condition of my employment,

        c. Tyson Fresh Meats will confirm in writing that they will pay all medical bills for any adverse reactions I encounter due to the vaccination which is required of me as a condition of my employment.

        d. Tyson Fresh Meats will confirm in writing that they will fully compensate my family if I suffer adverse reactions or death due to the vaccination which is required of me as a condition of my employment.

        e. Following acceptance of all conditions listed in this contract between Tyson Fresh Meats and me, this contract of "informed consent" must be signed by a fully qualified, Board- certified physician who will take full legal and financial responsibility for any injuries incurred by me due to the vaccination being required, and/or from any interactions by authorized personnel regarding these required vaccination procedures thus satisfying the conditions of my employment.

In the event that I should have to decline the offer of SARS CoV2 (Covid 19) vaccination as a condition of my employment, **please confirm** in writing that my declination will not compromise my Industrial Engineer position and that I will not suffer prejudice and discrimination as a result of declining, and that the Equal Employment Opportunity Commission (Title VII) and Genetic Information Nondiscrimination Act of 2008 (GINA) will be fully applied to my employment standing with Tyson Fresh Meats.

Sincerely,

Lynn A. McAllister, Industrial Engineer, Emporia Plant of Tyson Fresh Meats

120. Tyson was not engaging in any good faith interactive process with Mr. McAllister. Tyson would not and did not respond substantively to the important questions Mr. McAllister asked. Tyson still demanded that Mr. McAllister provide informed consent to its promoted covid-19 vaccine injections.

121. Tyson's misrepresentations were purposed and then resulted in Tyson employees engaging in an artificial and flawed consideration and balancing of the two promoted vaccine's benefits and risks, including that of myocarditis, when making their vaccination decision.

122. Had Tyson employees known the truth about the efficacy of these Covid-19 vaccines, a substantial portion would likely have opted for an alternative or foregone inoculation altogether.

123. In addition, Tyson employees were more susceptible to trusting and acting upon Tyson's misrepresentation campaign because of the significant levels of fear and anxiety amongst the public regarding the negative health, financial, and social impacts caused by the pandemic.

124. Tyson further capitalized on the public's vulnerabilities by misleadingly casting itself and those vaccines as the champions of "science" that would bring about an end of the pandemic and return America to normal.

125. Tyson misrepresented and obscured the truth about highly relevant aspects concerning a Covid-19 vaccine's safety and efficacy, thereby directly impacting each Tyson employee's decision-making process concerning vaccination status to their detriment. Tyson's deception discouraged, hindered, or prevented Tyson employees, including Mr. McAllister, from obtaining information material to properly balancing the benefits and risks of Tyson's vaccine mandate.

126. Tyson employees were lulled into misunderstanding and misperceiving the promoted vaccines' actual levels of effectiveness, and this flawed understanding

inherently distorted the risk/benefit analysis in Tyson's favor by artificially inflating a vaccine's perceived safety and efficacy.

**127.** "To state a substantive due process claim, a plaintiff must allege (1) a valid liberty or property interest, (2) which the government infringed in an arbitrary or irrational manner." *Health Freedom Def. Fund, Inc. v. City of Hailey, Idaho*, 590 F. Supp. 3d 1253, 1265 (D. Idaho 2022).

**128.** Mr. McAllister is a member of a politically unpopular group, the unvaccinated, that some leaders have blamed for prolonging the Covid-19 pandemic. See Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), available at https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (referring to Covid as "pandemic of the unvaccinated").

**129.** "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993).

**130.** Tyson's Covid vaccine policy was arbitrary because it distinguished between vaccinated and unvaccinated employees and yet the situations of these employees are indistinguishable because vaccinated and reporting Tyson employees can become infected with COVID, become re-infected with COVID, and can transmit COVID to fellow employees.

**131.** In other words, Tyson's policy does not accomplish its stated purpose. Tyson knew that, given that public health officials had admitted as much by the time it issued the policy, but that it enacted the policy to target the politically unpopular group of unvaccinated employees.

**132.** When Mr. McAllister received notification of his termination, Tyson then made up false statements, then outlined a sham procedure in which Mr. McAllister lost his job but could then try to apply for position with Tyson, and then did not bother to identify the actual reason for his termination – instead it provided him a sham smorgasbord of possible reasons:

16



As an accommodation for your request to be exempted from Tyson's mandatory COVID-19 vaccination requirement, you were placed on a Leave of Absence Plus (LOA+). After carefully considering the current circumstances, including the decline in COVID-19 infections and the mitigation factors in place since the start of the pandemic, Tyson made the decision to offer team members on a COVID related LOA+ the opportunity to return to work, subject to the availability of a position that you are qualified to perform.

As a result of one of the following circumstances, your employment with Tyson Foods has been terminated:

- You did not contact Human Resources within the specified timeframe listed in your return-to-work letter to indicate your intent to return from your leave of absence.

- A same or like position was not available.

- The same, or a like, position was available, and you refused the offered position.

- You were not able to return to the offered position within the required timeframe.

If you have questions or need additional information, please contact the Human Resources department at the location where you were last employed.

Human Resources
Tyson Foods

**133.** Mr. McAllister was terminated from his employment because of his refusal of the medical treatment status when other Tyson employees who were in the medical treatment class were not terminated.

**134.** Defendant directly caused the plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses.

**COUNT II**
**FAILURE TO ACCOMMODATE**
**VIOLATION OF ADA & REHAB ACT**

**135.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**136.** Plaintiff bring this action against the defendant under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. §§ 12101 et seq., which incorporates, through 42 U.S.C. § 12117, the powers, remedies, and procedures set forth in Title VII of the Civil Rights Act of 1964, as amended, included in 42 U.S.C. § 2000e et seq., in addition to its implementing Regulations, the Rehabilitation Act of 1973, as amended ("Rehabilitation Act"), 29 U.S.C. §§ 701 et seq.

**137.** On September 17, 2021, Lola Hithon, Vice President, Employee Relations and Compliance for Tyson Foods Inc, stated to Mr. McAllister that "this letter confirms that your request for a disability or religious accommodation from Tyson's mandatory vaccination requirement has been granted and will begin on October 1, 2021 for corporate team members and on November l, 2021 for plant team members. Because the pandemic raises complex medical and scientific issues, the status of the accommodation is subject to change."



**Tyson**

September 17, 2021

This letter confirms that your request for a disability or religious accommodation from Tyson's mandatory vaccination requirement has been granted and will begin on October 1, 2021 for corporate team members and on November 1, 2021 for plant team members. Because the pandemic raises complex medical and scientific issues, the status of the accommodation is subject to change.

If your accommodation is an unpaid leave of absence, your local HR Manager will indicate whether the leave is job-protected or not. If you are placed on a leave of absence and your job is not protected, it may be necessary to fill your position.

In the coming months, risks may be mitigated in other ways which may allow you to return to work. If a return-to-work option becomes available, you will be notified.

The reasonableness of your accommodation will be assessed on an ongoing basis and is subject to change at any time. If the company determines that providing you with an accommodation is an undue hardship, does not eliminate the direct threat of disease spread, or is unreasonable, your accommodation may be revoked or modified. If your accommodation is revoked or modified, you will be expected to immediately comply with Tyson's Mandatory Vaccination Policy or further instructions to avoid termination.

Should you have any questions, please reach out to your local HR partner.

*Lola Hithon*

Lola Hithon
VP, Employee Relations and Compliance

Tyson Foods, Inc.
2200 W. Don Tyson Pkwy., Springdale, AR 72762
Phone: 1-800-643-3410   Website: www.tysonfoods.com

**138.** On October 14, 2021, Mr. McAllister communicated to Tyson again of his religious objections to consenting to covid-19 vaccine injections. He stated in part the following:

> The following reasons explain why my sincerely held religious belief precludes me from taking the Tyson Fresh Meats mandated SARS CoV2 (Covid 19) injection:
>
> - Abortion is wrong. As a Christian, I believe it is immoral for any institution or government authority to base, in whole or in part an individual's access to employment on receiving a medication derived from an abortion. The design, production, or testing of vaccines using the remains of aborted human beings, who did not consent to be experimented on and whose body parts were trafficked to provide the means for vaccine creation, is morally unacceptable.
>
> - The fruits and results of abortion are wrong.
> - All three SARS CoV2 (Covid 19) injections were developed for research and produced from aborted fetal cell lines HEK-293 and PER.C6
>
>> - All three SARS CoV2 (Covid 19) injections were tested on aborted fetal cell lines HEK-293 and PER.C6.
>> - The fetus did not give informed consent to be murdered and have his/her body, specifically HEK-293 and PER.C6 cells used for research and SARS CoV (Covid 19) Injections.

**139.** On October 26, 2021, Gary Denton with Tyson, emailed Mr. McAllister that October 31, 2021, would be Mr. McAllister's last work day and Tyson placed Mr. McAllister on unpaid leave of absence on November 1, 2021.

**140.** In a COBRA CONTINUATION COVERAGE ELECTION form from Tyson to Mr. McAllister, it stated that Mr. McAllister had been involuntarily terminated from employment on November 1, 2021.

**141.** On December 13, 2021, Mr. McAllister had a medical surgery.

**142.** His treating physician provided a return to work effective March 14, 2022.

**143.** According to the defendant, plaintiff has a physical or mental impairment that does not substantially limit major life activities but is treated by Tyson as constituting such limitation.

**144.** According to the defendant, plaintiff has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment.

**145.** Plaintiff is treated by Tyson as having a substantially limiting impairment.

**146.** Tyson's vaccine policy considers the plaintiff' medical condition of being "unvaccinated" as a disability.

**147.** Tyson terminated the plaintiff because of his perceived disability constituting not having artificially induced immunities to the SARS virus.

**148.** The considered disorder by Tyson was a condition concerning plaintiff's functions such as speaking, breathing, learning, and working.

**149.** Defendant discharged the plaintiff from his employment.

**150.** Defendant discharged plaintiff because of this perceived disability.

**151.** There was nothing in the Company's job description of a plaintiff's job that required that they have immunities to any disease.

**152.** The Company implemented a written anti-discrimination policy which prohibits discrimination against employees based on the employee's religion, yet the Company has discriminated on the basis of religion and disability.

**153.** Tyson regarded Mr. McAllister as having a physical impairment that substantially limited his ability to work, based on Defendant's knowledge of his immunity and vaccine status.

**154.** Throughout his employment, the plaintiff could perform the essential functions of his job with or without accommodation.

**155.** Plaintiff case is predicated on direct evidence of disability discrimination and a claim of pretext, *i.e.*, circumstantial evidence.

**156.** The plaintiff was terminated because the Company regarded him as disabled in that: the Company either: (1) as a result of the attitudes of others toward such impairment considered the plaintiff as having a physical or mental impairment that substantially limits major life activities only; (2) was treated by Tyson as having a substantially limiting impairment even though the plaintiff had no such impairment; or (3) Tyson's vaccine policy and actual termination of this plaintiff considered his medical condition as not being "fully vaccinated" as disability.

**157.** The Company's policy and its termination of the plaintiff's employment demonstrate that it views employees not "fully vaccinated" as having inferior immune systems. According to the Company, Mr. McAllister's purportedly inferior immune system did not and would not protect other employees sufficiently or as well as him "fully vaccinated" colleagues, irrespective of the time lapse of receiving any vaccine injection, and thus she would be a direct threat to the safety of fellow employees and customers being purportedly more likely to transmit the Covid 19 virus.

**158.** According to the Company, the plaintiff's immunity disability significantly restricted each in the ability to perform not merely a particular job but an entire class and broad range of jobs at the Company.

**159.** Defendant has provided inconsistent explanations for the plaintiff's discharge, including claiming his religious beliefs were insincere, claiming workplace safety when vaccination status is not a work place activity and do not prevent transmission, showing the pretextual nature of Defendant's explanation for discharging the plaintiff.

**160.** Defendant directly caused the plaintiff damages, including economic harm, emotional distress, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other losses under the aforementioned federal statutes.

**COUNT III**

**VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, ET SEQ.**

**RELIGIOUS DISCRIMINATION – DISPARATE TREATMENT**

**161.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**162.** Plaintiff holds a sincere religious beliefs that precludes him from consenting to Covid-19 vaccine injecting. Tyson has speculated as to the sincerity of his beliefs but he provided a set of beliefs that was comprehensive and clear, even if the Company misconstrued them, did not understand, or wanted to discredit those beliefs.

**163.** Plaintiff informed Tyson of those beliefs and requested religious accommodations from the vaccine mandate.

**164.** By requesting religious accommodations from Tyson, Plaintiff established himself as a member of a protected class.

**165.** Plaintiff's employee records demonstrate unquestionably that he was qualified for the position. That is why, prior to the mandate, the plaintiff had no indication that his job was in jeopardy – indeed, he had been successful for a substantial amount of time prior to the vaccine edict and, absent Tyson's unlawful actions, would still be working there.

**166.** Plaintiff suffered an adverse employment action when Tyson threatened to suspend his pay and then terminated him after he declined – on religious grounds – to consent to multiple injections of a COVID-19 vaccine.

**167.** At the same time, others at the Company were provided accommodations from the vaccine mandate for secular reasons and not terminated.

**168.** Tyson contended that Mr. McAllister cannot be sincere but provided no explanation as to how or why.

**169.** By denying his religious exemption to the mandatory COVID-19 vaccination policy which required the plaintiff to consent to multiple vaccine injections and then terminating his employment, the defendant violated the plaintiff's rights under Title VII.

**170.** Title VII provides, inter alia, that it "shall be an unlawful employment practice for an employer … to discharge any individual … because of such individual's … religion …." 42 U.S.C. § 2000e-2(a)(1). Title VII further defines "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

**171.** Accordingly, under Title VII it is unlawful "for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of her employees…." *Groff v. DeJoy,* 600 U.S. 447 (2023); *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) ("The employer violates the statute unless it 'demonstrates that [it] is unable to reasonable accommodate … an employee's … religious observance or practice without undue hardship on the conduct of the employer's business.'") (quoting 42 U.S.C. § 2000e(j)).

**172.** Because of the "size and operating cost" of the employer Tyson, Tyson, as a relatively larger business, bears a heavier burden in proving undue hardship.

**173.** Defendant conducted no economic analysis as to the financial cost of all possible accommodations to Mr. McAllister.

**174.** Tyson did not conduct any analysis in which it considered, then ruled out, all accommodations.  Rather, Tyson thought it was enough to show one accommodation would be an undue hardship.

**175.** Defendant did not conduct any economic analysis regarding permitting Mr. McAllister to remain employed as not being "fully vaccinated" imposed a "substantial increased costs in relation to the conduct of [Tyson's] particular business" on Tyson's overall business.

**176.** Prior to Mr. McAllister's termination, Tyson nowhere identified any actual financial costs it will face – much less substantial increased costs affecting its entire business – if it granted this one accommodation to Mr. McAllister.

**177.** Tyson did not consider on its own (*sua sponte*) all possible accommodations for Mr. McAllister's religious beliefs prior to its adverse employment actions.

**178.** Defendant was recklessly indifferent to the plaintiff's federally protected rights.

**179.** And at the same time Tyson was discriminating against the plaintiff, the Company knew that vaccinated employees were regularly contracting and spreading COVID-19.

**180.** Prior to its Covid-19 vaccine enforcement date, Tyson was able to efficiently provide any services provided by this plaintiff to any customer or fellow employee.

181. Tyson was able to efficiently provide any requested services by a customer while providing a religious accommodation regarding Mr. McAllister's religious convictions.

182. Plaintiff's work was outstanding, and he had no performance issues throughout his employment with Defendant.

183. Tyson was not committing any OSHA workplace safety violations in permitting the plaintiff to be employed and interact with customers and co-employees prior to the effective date of Tyson's Covid-19 vaccine policy.

184. Tyson would not have committed any OSHA workplace safety violations in permitting the plaintiff to be employed unvaccinated and interact with customers and co-employees after the effective date of Tyson's Covid-19 vaccine policy.

185. Tyson did not act in good faith in any interactive communication process. Tyson refused to respond to Mr. McAllister's questions regarding his consent to being vaccine injected.

186. Tyson deliberately wanted communications to be conducted orally for improper reasons. When Mr. McAllister requested what the LOA+ policy was and asked for the purported LOA+ policy referred by Tyson, Gary Denton, an employee of Tyson, stated on October 26, 2021, to Mr. McAllister that "I will not provide written policy.......As you know the past couple years have been fluid which has resulted in the company polices being reviewed and administer differently."

187. Tyson did not conduct a reasonable investigation into the plaintiff's immunity status, whether he had similar or greater immunity to a Covid-19 virus as compared to a vaccine injected employee having artificially induced temporary immunities.

188. Tyson did not require employees to report events in which a customer complained or was turned away because of the Tyson's employee's immunity or vaccine status prior to effective date of Tyson's Covid-19 policy.

189. Tyson did not conduct a reasonable investigation into whether requiring Mr. McAllister to be covid-19 vaccine injected would present a substantial economic cost to the overall business of Tyson or prevent the transmission of the Covid-19 virus prior to his termination.

190. It was not an undue hardship upon Tyson to provide Mr. McAllister a religious accommodation in performing of his essential functions as an employee of Tyson.

191. Allowing Mr. McAllister to work unvaccinated did not increase the use or claim of employee sick days for that period of time and did not impose a substantial economic cost to Tyson's overall business.

192. In fact, there were vaccinated Tyson employees that took sick leave because of a self-reported or diagnosed Covid-19 infection prior to the Tyson vaccination deadlines and afterwards.

**193.** Tyson has no documentation that its vaccination policy reduced the spread of Covid-19 infections or reduced the number of sick days taken by an employee self-reporting or diagnosed with a Covid-19 infection.

**194.** Tyson has no documentation as to any customers, their number, or dollar amount in sales being lost or reduced by allowing the plaintiff to be employed at his position prior to the effective date of Tyson's vaccination requirement.

**195.** Tyson has no documentation as to any customers, their number, or dollar amount in sales being gained as a result of terminating either plaintiff's employment at Tyson.

**196.** After Mr. McAllister was terminated, Tyson has no documentation showing that there was any reduction in an employee's use of sick days, or health insurance claims arising from a Covid-19 infection.

**197.** While this plaintiff was employed, Tyson has no documentation that it would be required to have other workers work overtime, or hire additional employees or any staff as a direct result of allowing Mr. McAllister to be employed not being fully vaccinated during the time period of Tyson's Covid-19 vaccine policy enactment through when Mr. McAllister was terminated.

**198.** Tyson conducted no analysis and has no documentation that demonstrates Tyson would be required to rearrange staffing or incur additional economic costs, including during the time period of Tyson's Covid-19 vaccine policy enactment in allowing Mr. McAllister to remain employed in his position not being fully vaccinated.

**199.** Allowing Mr. McAllister to work unvaccinated did not cause employee sicknesses, disruptions, jeopardize safety, cause other employees to work longer hours, nor did it cause Tyson to lose any customer traffic.

**200.** Tyson conducted no economic analysis to Tyson's overall business as to allowing Mr. McAllister to work not being fully vaccinated or whether his status cause, under every possible accommodation, employee sicknesses, disruptions, jeopardize safety, cause other employees to work longer hours, or whether Mr. McAllister's status as not being fully vaccinated would cause Tyson to lose any customer traffic.

**201.** Tyson conducted no studies or analysis yielding any documentation that allowing Mr. McAllister to work being not fully vaccinated caused or increased employee sicknesses, disruptions, safety risks, or caused or contributed to other employees being required to work longer hours.

**202.** Tyson was not required to hire any additional workers nor did it suffer the loss of production because of allowing Mr. McAllister to work unvaccinated through the time of his termination.

**203.** Since terminating the plaintiff and replacing him with another employee at the same position, Tyson has no evidence of any loss or gain of customer satisfaction,

store traffic, or profits associated with terminating this plaintiff's employment and replacing him with a fully vaccinated employee.

**204.** Tyson has no evidence of any loss or increase in market share, customer loyalty, or store traffic due to accommodating or not accommodating the religious beliefs of Mr. McAllister at any time.

**205.** Similarly, Tyson has no evidence of an increase in customer satisfaction, traffic, or profits associated with not providing religious accommodations to Tyson employees.

**206.** The fact is Tyson adopted a process that does not even permit the possibility of approval for a religious accommodation because Tyson predetermined that anyone unvaccinated for religious reasons would present a workplace safety issue that could not be accommodated without consideration of any economic cost analysis to Tyson's overall business.

**207.** Tyson told the EEOC in its response to Mr. McAllister's EEOC charge that it could show undue hardship under "de minimis impact" which is wrong as a matter of law.

**208.** All this evidences pretext on the part of Tyson since the Company has proffered an undue hardship explanation that is "unworthy of credence" – it is "apparent that unlawful discrimination was more likely the employer's motivation." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

**209.** Religious employees who were willing to participate in safety measures such as symptomatic reporting, remote work, masking, and testing and/or who had natural immunity were terminated; secular employees who were induced with waning artificial immunities (even those immunized with an incomplete vaccine series providing arguably inferior immunization) were allowed to keep their jobs, as were secular employees with medical excuses not to take the vaccine.

**210.** Tyson's policies were thus punitive toward religious employees such as the plaintiff who should have been accommodated. Many, if not all of Tyson employees, developed some sort of natural immunity to the SARS virus and therefore posed an equal or lower risk to others than the vaccinated secular employees who had not previously contracted COVID-19.

**211.** Additionally, the plaintiff was willing to observe mitigation practices such as self-reporting of symptoms, remote work, masking, and testing. Not only had such measures been adequate for the prior 18 months of the pandemic, self-reporting, remote work and/or testing represented the most efficient means of reducing/preventing COVID-19 transmission for both vaccinated and unvaccinated individuals during workplace hours.

**212.** Yet Tyson treated religious employees worse because of their religious objection to the vaccine. (NOTE: A truly preventative policy would have required something

such as regular testing for all employees, especially those who had not previously recovered from a COVID-19 infection even if they were vaccinated.)

**213.**   In other words, Tyson required naturally immune religious employees to possess hybrid immunity (vaccine-based immunity + natural immunity (which studies demonstrated may actually reduce the totality and length of immunity)) and subjected them to heightened protocols in the name of workplace safety because of their religious beliefs. At the same time, Tyson rewarded secular vaccinated employees, even though they presented an equal or greater contagion hazard relative to religious naturally immune employees, because Tyson favored those employees' views on COVID-19 vaccines.

**214.**   Moreover, the Company enforced its policy with the full knowledge and with intent to adversely affect religious employees disproportionately. Indeed, instead of implementing plans to accommodate religious employees, Tyson implemented discriminatory policies and created a questionnaire designed to assist the Company in denying religious accommodation requests.  It is believed that after denying 100% of religious exemption requests, the Company cannot now argue that the accommodations process was actually instituted in good faith.

**215.**   Tyson never planned to provide this plaintiff a reasonable accommodation and its supposed "interactive process" sought only to gain information it might later be able to use against this plaintiff who deigned to push back on the Company's unlawful actions. Tyson subjected the plaintiff to its sham process, seeking information about people's beliefs, personal information, and medical histories even though the Company never planned to accommodate them anyway. This all took place because of this plaintiff's religious beliefs and they would not have had to undergo that process but for their sincerely held religious beliefs about the COVID-19 vaccine.

**216.**   Tyson plainly did not want religious requests to succeed and purposefully plotted to deny those requestors.

**217.**   Any non-discriminatory reason proffered by Tyson – such as increased safety – was pretextual. By allowing vaccinated employees to avoid necessary preventative measures like testing, while not even allowing exempt employees like the plaintiff to use them, the Company has undermined any legitimate nondiscriminatory reason it might have tried to claim as it relates to workplace safety. Moreover, as the evidence shows, the "direct threat to the health or safety of others in the workplace and/or to the colleague" (OSHA-Workplace-safety) legal and factual rationale for treating unvaccinated employees differently (especially those with natural immunity) was non-existent long before Tyson put religious employees out of work. At all relevant times, it was abundantly clear that these "vaccines" were not preventing transmission of the virus.  And added to the above, once the Omicron variant swept across the country, more evidence existed contradicting Tyson's policy as no vaccine served as a means to even reduce symptoms and certainly as any means to hinder

transmission. It was thus unlawful to discriminate against religious employees such as these plaintiff.

**218.** If Tyson's justification truly was to help provide for a safe work environment during the COVID-19 pandemic, the Company would not have chosen a Covid-19 vaccine requirement as a solution or singled out those who had natural immunity and/or were willing to submit to self-reporting, or testing for worse treatment because they could not take the vaccine for religious reasons.

**219.** The OSHA workplace health/safety argument contained in the statement "direct threat to the health or safety of others in the workplace and/or to the colleague" was clearly a pretext on nearly every level. Tyson's purposeful attack on religious beliefs is made apparent by Tyson's failure to investigate, its disregard of law and science, or its willful ignorance of the science and the CDC's guidance in March, July, and August of 2021, establishing that the vaccines would never prevent or even reduce Covid virus transmission.

**220.** Considering these factors, a strong inference of intentional religious discrimination exists, and any non-discriminatory reason asserted by Tyson is inauthentic.

**COUNT IV**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, ET SEQ.**
**RELIGIOUS DISCRIMINATION—FAILURE TO ACCOMMODATE**

**221.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**222.** Plaintiff holds a sincere religious beliefs that precludes him from consenting to a COVID-19 vaccine. Indeed, his beliefs were sincere enough to cause him to accept termination from a career he enjoyed rather than betray his beliefs.

**223.** Plaintiff informed Tyson of those beliefs and requested religious accommodations from its vaccine mandate.

**224.** Tyson refused to engage in an actual interactive process with the plaintiff regarding his religious accommodation request and instead responded silence or questions (or other coercion) designed to deter him from exercising his religious beliefs.

**225.** Tyson did not bother engaging in a true interactive process with religious accommodation seekers such as the plaintiff because it never intended to provide him with a reasonable accommodation.

**226.** Irrespective of the interactive process, Tyson failed to provide the plaintiff with reasonable accommodations for his religious beliefs.

**227.** In fact, Tyson failed to consider reasonable accommodations (such as self-reporting of symptoms, masking, testing, and natural immunity) because it never

intended to accommodate religious employees and was only interested in coercing them to take the vaccine.

**228.** The Company's attempts to dodge providing reasonable accommodations by casting aspersions on Plaintiff's religious objections to the vaccine fail on their face. The plaintiff detailed his sincerely held religious beliefs only to be rejected when the Company claimed to the EEOC that he had not shown a satisfactory basis for an accommodation on religious grounds. This position is post hoc and was a sham, however, since the denial was predetermined before the request was made as part of a pattern of discrimination against those unable to consent to COVID-19 vaccine injections because of their sincerely held religious beliefs.

**229.** The rejections of the plaintiff's beliefs were simply transparent rejections of religion as a suitable reason not to become one of "the vaccinated." Tyson did not welcome religious requests and determined as a result not to accept religious accommodation requests. The canned denial communications that failed to grapple with any requestor's requests are further proof that the Company did not treat religious requests in good faith align with the Company's overall pattern of discrimination.

**230.** Tyson thereby discriminated against the plaintiff because of his religious beliefs.

**231.** Tyson's failure to provide religious accommodations has harmed and will continue to harm this plaintiff.

**232.** By failing to engage in a true interactive process or offer any reasonable accommodation, Tyson's discriminatory actions were intentional and/or reckless and in violation of Title VII.

**COUNT V**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, ET SEQ.**
**RELIGIOUS DISCRIMINATION—RETALIATION**

**233.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**234.** Plaintiff engaged in protected activity when he requested religious accommodations from Tyson's vaccine mandate.

**235.** As with other religious employees, Tyson responded with improper treatment of the plaintiff's religious beliefs aimed at forcing him to acquiesce while having prepared a legal defense against his Title VII rights ahead of time.

**236.** The Company also subjected religious employees such as this plaintiff to unwanted coercion and other tactics aimed at punishing their beliefs and making them regret requesting an accommodation based on religious grounds.

**237.** Mr. McAllister was threatened with unpaid leave and termination if he did not comply with Tyson's mandate in the manner demanded by Tyson.

**238.** The "choice" Tyson has given religious employees such as this plaintiff "has created a crisis of conscience, pressuring them to abandon their religious commitments. By threatening termination, [Tyson] has enlisted employees and their families in the project of reforming employees' religious commitments. Putting employees to this coercive choice imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses." *See Sambrano*, 19 F.4th at 842 (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level").

**239.** This coercion was a concerted effort from Tyson management—a fact the Company did not attempt to conceal.

**240.** Finally, Tyson terminated the plaintiff as a result of his request for a religious exemption.

**241.** Plaintiff's religious beliefs and protected activity were the causes of Tyson's adverse employment action.

**242.** By retaliating against the plaintiff for engaging in protected activity, Tyson violated Title VII. This violation has harmed and continues to harm this plaintiff.

**COUNT VI**

**VIOLATION OF TITLE VII, 42 U.S.C. § 2000E, ET SEQ.**

**RELIGIOUS DISCRIMINATION—DISPARATE IMPACT**

**243.** Plaintiff restates the foregoing paragraphs as if set forth fully herein.

**244.** Plaintiff holds a sincere religious beliefs that precludes him from consenting to a COVID-19 vaccine. Indeed, his beliefs were sincere enough to cause him to undergo termination from a career he enjoyed rather than betray his beliefs.

**245.** Plaintiff informed Tyson of those beliefs and requested religious accommodations from the vaccine mandate, thus identifying himself to the Company as part of a protected class.

**246.** Tyson's mandate had an adverse effect on this plaintiff who was unable to consent to a COVID-19 vaccine injection for religious reasons.

**247.** This violation of Title VII has harmed and continues to harm this plaintiff.

### PRAYER FOR RELIEF AS TO ALL FEDERAL COUNTS

WHEREFORE, this plaintiff requests that the Court:

a. Find that Tyson has violated Mr. McAllister's fundamental rights to not consent to medical treatments.

b. Find that Tyson has targeted Mr. McAllister for different treatment as compared to other Tyson employees.

c. Declare that Tyson has violated Title VII by discriminating against employees seeking religious accommodations to its COVID-19 vaccine mandate, disfavoring their exemption requests because they were based on religious reasons rather than secular ones.

d. Declare that Tyson has violated Title VII by failing to engage in a good-faith interactive process and provide reasonable accommodations in response to requests for religious accommodations to its COVID-19 vaccine mandate.

e. Declare that Tyson has violated Title VII by retaliating against employees who engaged in protected activity.

f. Declare that Tyson's vaccine mandate had a disparate impact on those unable to take a COVID-19 vaccine for religious reasons.

a. Award the Plaintiff nominal and actual damages including:

    i. Termination or employee misconduct contained in his personnel file;
    ii. Deterioration in job skills;
    iii. Lost bonus pay;
    iv. Lost seniority;
    v. Loss of preferential shifts and other adverse impacts on working conditions;
    vi. Loss of wages;
    vii. Extreme stress and anxiety;
    viii. Attorney fees and costs; and
    ix. Punitive damages

Pursuant to Federal Rule of Civil Procedure 38, the plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

### PLAINTIFF HEREBY REQUESTS A JURY TRIAL

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:            913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Verification of Complaint

I, Lynn McAllister, am the plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Date:  6/21/24

By: _____
Lynn McAllister

**31**